UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| FAUSTINA ROBERTS,<br><br>            Plaintiff,<br><br>     v.<br><br>FERRY COUNTY and PETE WARNER,<br>individually,<br><br>            Defendants. | NO. CV-07-149-EFS<br><br>**ORDER DENYING DEFENDANTS'<br>MOTION TO STRIKE AND GRANTING<br>AN DENYING IN PART DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT** |

Before the Court, without oral argument, are Defendants Ferry County and Sheriff Peter Warner's Motion to Strike (Ct. Rec. 29) and Motion for Summary Judgment (Ct. Rec. 11). After reviewing the submitted material and relevant authority, the Court is fully informed and denies Defendants' motion to strike and grants and denies in part Defendants' summary judgment motion. The reasons for the Court's Order are set forth below.

## I. Background

The following facts are set forth in a light most favorable to Plaintiff:[1]

In 2004, Ferry County actively sought qualified candidates to serve as corrections officers. (Ct. Rec. 28 at 2.) To fill vacancies, the

---

[1] In a motion for summary judgment, the facts are set forth in a light most favorable to the nonmoving party - here, that is Plaintiff. *Leslie v. Grupo ICA,* 198 F.3d 1152, 1158 (9th Cir. 1999).

ORDER * 1

Ferry County Civil Services Commission ("CSC") submits a list of three (3) qualified candidates to Defendant Warner. *Id.* Defendant Warner reviews the list, makes a selection, and fills the vacancy. *Id.* During 2004, however, the CSC lists submitted to Defendant Warner contained fewer than three (3) names due to a lack of qualified candidates. *Id.* When applicant shortages occur, regulations permit Defendant Warner to review the entire applicant pool and appoint someone on an "emergency basis." Emergency appointments are temporary. *Id.* at 3.

Defendant Warner hired Mickey McClain-Brown on an emergency basis beginning on January 3, 2005; Defendant Warner hired Gordon Winter on an emergency basis beginning April 2, 2005. *Id.* at 2-3. Neither Ms. McClain-Brown nor Mr. Winter were qualified to serve as corrections officers because they did not pass the CSC physical exam. *Id.* at 3.

Meanwhile, Plaintiff Faustina Roberts applied for a corrections officer position with the Ferry County Sheriff's Department on September 16, 2004. (Ct. Rec. 28 at 2.) Unlike Ms. McClain-Brown and Mr. Winter, Plaintiff was qualified to serve as a corrections officer - she passed the CSC physical exam in May 2005. (Ct. Rec. 1 at 3.)[2] Plaintiff's name

---

[2]The exact date Plaintiff passed the CSC physical exam is unclear. Plaintiff's Complaint alleges she passed the exam in August 2005 (Ct. Rec. 1 at 3); Plaintiff's Statement of Facts, on the other hand, alleges she passed the exam in March 2005, and again in May 2005 - the May retake occurred due to allegations that Plaintiff cheated in the March exam. (Ct. Rec. 23 at 3). The Court will rely on the May 2005 completion date because it is the earliest date Plaintiff passed without controversy.

ORDER * 2

was subsequently submitted to Defendant Warner for consideration. (Ct. Rec. 23 at 3.)

In December 2005, Plaintiff sent a letter to the CSC complaining that Defendant Warner continued to employ Mr. Winter as a corrections officer even though he did not pass the CSC physical exam. (Ct. Rec. 28 at 3.) Mr. Winter's emergency appointment ended in February 2006. *Id.* at 2. After Mr. Winter's departure, Defendant Warner contacted CSC Commissioner Sam Jenkins and informed him that two (2) corrections officer positions were available. (Ct. Rec. 28 at 4.) Shortly thereafter, Defendant Warner contacted Plaintiff to set up an interview for one of the available corrections officer positions - they agreed on a March 31, 2006 interview date. (Ct. Rec. 23 at 4.) Defendant Warner informed Plaintiff she would be interviewing for a part-time position; CSC Commissioner Jenkins, however, informed Plaintiff that the available corrections officer positions were full-time positions. *Id.* at 5.

Three (3) days before the interview, Plaintiff contacted Defendant Warner's office and spoke with Peter Brandon to inform them a conflict came up and that she would need to reschedule. *Id.* Plaintiff attempted to reach Defendant Warner three (3) additional times before the scheduled interview - she was unable to do so. Plaintiff spoke with Mr. Brandon each time, and each time Mr. Brandon insisted he passed her messages along to Defendant Warner. *Id.* at 5. Defendant Warner denies receiving Plaintiff's messages. (Ct. Rec. 28 at 4.)

On March 30, 2006, Defendant Warner e-mailed the CSC and asked that Plaintiff's application be "passed for cause" because she did not reasonably attempt to reschedule her interview. (Ct. Rec. 16, Ex. 1.)

ORDER ~ 3

In April 2006, Defendant Warner received a new candidate list from the CSC containing one name - Erin Boone. (Ct. Rec. 28 at 5.) Defendant Warner hired Ms. Boone to fill the first corrections officer opening; he hired Maia Pugliese, another female, to fill the second corrections officer opening. *Id.* at 5-6. On May 11, 2007, Plaintiff filed a Complaint against Defendant Warner and Ferry County alleging gender discrimination and retaliation. (Ct. Rec. 1.) On July 11, 2008, Defendants filed the summary judgment motion now before the Court.

## II. Discussion

### A. Standard

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id.* at 322. "When the moving party has carried its burden of [showing that it is entitled to judgment as a matter of law], its opponent must do more than show that there is some metaphysical doubt as to material facts. In the language of [Rule 56], the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted) (emphasis in original opinion).

ORDER ~ 4

When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). This does not mean that a court will accept as true assertions made by the non-moving party that are flatly contradicted by the record. *See Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

**B. Motion to Strike**

As a threshold matter, Defendants seek to strike an excerpt from Plaintiff's deposition and a time line created by Plaintiff as inadmissible hearsay. (Ct. Rec. 29.) The Court declines to strike either the excerpt or the time line. The deposition excerpt involves third-party Peter Brandon's statements to Plaintiff concerning her attempts to contact Defendant Warner in order to reschedule her interview. Mr. Brandon's statements are not hearsay and admissible as vicarious admissions because the statements were made during Mr. Brandon's employment as deputy Sheriff and relate to matters within the scope of employment. *See* FED. R. EVID. 801(d)(2)(D). Plaintiff's self-created time line is also admissible because it is based on her personal knowledge and incorporated by her declaration. (Ct. Rec. 32.) Accordingly, the Court denies Defendants' motion to strike.

**C. Gender Discrimination Claim**

The Washington Law Against Discrimination ("WLAD") makes it an unfair practice for any employer to refuse to hire, to discharge, or to discriminate against any person based on sex. RCW 49.60.180(1). WLAD claims are governed by the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Marquis v. City of Spokane*, 130 Wn.2d 97, 113 (1996).

Under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must first establish a prima facie discrimination case. *Kastanis v. Educ. Employees Credit Union,* 122 Wn.2d 483, 490 (1993). If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its adverse employment action. *Id.* To prevail, the plaintiff must then show that the employer's purported reason for the adverse employment action is merely a pretext for a discriminatory motive. *Id*. at 491. Although the burden shifts back and forth between the parties, the plaintiff bears the ultimate burden of demonstrating that the defendant engaged in intentional discrimination. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (citations omitted).

Defendants argue Plaintiff has not established a prima facie case because the two (2) individuals hired in her stead were women. (Ct. Rec. 12 at 4.)  Plaintiff responds that Defendants' continued employment of an unqualified male demonstrates gender discrimination. (Ct. Rec. 21 at 7.)

To establish a prima facie gender discrimination case, Plaintiff must show that (1) she belongs to a protected class, (2) she was qualified for the position, and (3) she did not receive the position due

ORDER * 6

to her sex. *See Marquis,* 130 Wn.2d at 113-14; *Kastanis,* 122 Wn.2d at 490; *Hill v. BCTI Income Fund-I,* 144 Wn.2d 172, 181 (2001).[3] Establishing a prima facie case creates a "legally mandatory, rebuttable presumption" of discrimination. *Hill,* 144 Wn.2d at 181.

Here, Plaintiff meets the first two (2) prongs - she belongs to a protected class - female - and was qualified for the corrections officer position in May 2005 after passing the CSC physical exam without controversy. Plaintiff cannot, however, demonstrate that she failed to receive the position based on her gender.

It is true that, at first glance, Defendant Warner's blackguard behavior could be construed as gender discrimination. After all, Defendant Warner left Plaintiff's application pending for seven (7) months without action. In fact, Plaintiff had to file a complaint with the CSC before Defendant Warner would even interview her. When the interview was set up and Plaintiff had to reschedule, Defendant Warner asked that Plaintiff's application be "passed for cause" because she did not reasonably attempt to reschedule.

A closer look reveals six (6) facts that belie Plaintiff's gender discrimination claim. First, Defendant Warner's 2005 emergency appointments occurred before Plaintiff was fully qualified to serve as a corrections officer. Defendant Warner appointed Ms. McClain-Brown in January 2005 and Mr. Winter in April 2005, well before Plaintiff passed the CSC physical exam in May 2005. Second, Defendant Warner's emergency

---

[3] Gender discrimination's prima facie elements are malleable and will vary depending on each case's facts. *See McDonnell Douglas Corp.,* 411 U.S. at 802 n.13.

ORDER * 7

appointments were gender neutral, i.e., he hired one (1) female and one (1) male. Third, even though Mr. Winter had yet to pass the CSC physical exam, Defendant Warner hired him on an emergency basis because he had previously worked as a volunteer reserve deputy and was familiar with both staff and office procedures. (Ct. Rec. 28 at 5.) Fourth, Defendant Warner hired two (2) women to fill the available corrections officer positions after passing over Plaintiff's application. Fifth, the corrections department has historically staffed more women than men. *Id.* And sixth, Defendant Warner's unscrupulous actions towards Plaintiff are better explained by his hostile relationship with her husband, Bret Roberts, than Plaintiff's gender.

Bret Roberts and Defendant Warner have a history. In 1995, a Ferry County Deputy investigated Mr. Roberts for alleged wrongdoing and spread false accusations about him throughout the community. Mr. Roberts confronted Defendant Warner about the deputy's conduct - a heated exchange occurred. (Ct. Rec. 23 at 6.) Sometime later, Mr. Roberts, acting in his role as Ferry County Republican Party's chairman, threatened to stop supporting Defendant Warner if allegations that he misappropriated grant funds in his capacity as Defendant were true. And finally, Defendant Warner instructed his deputies in the Fall of 2004 not to assist Mr. Roberts if he needed help executing his duties as a City of Republic police officer. (Ct. Rec. 23 at 7.)

Even drawing all inferences in Plaintiff's favor, the facts show that Defendant Warner did not pass over Plaintiff's application based on her gender; rather, he passed over Plaintiff's application based on his dislike for her husband. Because Plaintiff cannot meet her prima facie burden, it is unnecessary to proceed through the remaining steps in the

ORDER ~ 8

*McDonnell Douglas* burden-shifting analysis.  Summary judgment on this claim is appropriate.  *Kastanis,* 122 Wn.2d at 490.

**D. Freedom of Association/Right to Privacy Claim**

Defendants assert Defendant Warner's relationship with Plaintiff's husband had no bearing on his decision to "pass over" her application for the available corrections officer position.  (Ct. Rec. 12 at 9.) Plaintiff insists Defendant Warner's conduct violates her freedom to associate and right to privacy.  (Ct. Rec. 21 at 11.)

The Supreme Court has articulated that the broad constitutional right to "freedom of association" exists in two (2) distinct senses. One is referred to as "the freedom of intimate association" and protects highly personal relationships from unjustified state interference. *Roberts v. U.S. Jaycees,* 468 U.S. 609, 617 (1984).  The other is referred to as "the right to associate for expressive purposes" and protects individuals seeking to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  *Id.* at 622.  Nothing in the facts suggest Defendants allegedly interfered with Plaintiff's right to associate for expressive purposes; the focus is instead on Defendants' allegedly retaliatory conduct arising out of Plaintiff's intimate relationship with her husband.[4]

---

[4]The Court need not perform a separate analysis for Plaintiff's right to privacy claim because the freedom of association substantially overlaps with the right of privacy.  *Fleisher v. City of Signal Hill,* 829 F.2d 1491, 1499 (9th Cir. 1987).  The two rights are so interrelated, in fact, that the Supreme Court often treats the freedom of association and

ORDER * 9

While it is clear that Plaintiff's alleged constitutional violation arises out of the freedom of intimate association, it is less clear as to the origin of this right and what doctrinal analysis applies to determine if she asserted sufficient evidence to survive summary judgment.

Ninth Circuit jurisprudence suggests that the freedom of intimate association arises from protections guaranteed in the Fourteenth Amendment Due Process Clause. *See, e.g., IDK, Inc. v. County of Clark,* 836 F.2d 1185, 1192 (9th Cir. 1988). Other circuits take a different view, citing the First Amendment when addressing alleged freedom of intimate association violations involving martial relationships. *See, e.g., Adler v. Pataki,* 185 F.3d 35 (2d Cir. 1999) (determining that an alleged retaliatory dismissal based on a spouse's conduct should be analyzed as a claimed violation of a First Amendment right of intimate association); *Singleton v. Cecil,* 176 F.3d 419, 423 (8th Cir. 1999) (rejecting claim that discharge of at-will police employee violated his First Amendment right of intimate association where wife plotted to have police chief arrested); *Adkins v. Bd. of Educ.*, 982 F.2d 952, 955 (6th Cir. 1993) (upholding claim that denial of continued employment because of school superintendent's dislike of employee's husband violated her First Amendment right of intimate association).

The Second Circuit sought to reconcile courts' differing doctrinal approaches when examining claims alleging burdens on marital relationships. *See Adler,* 185 F.3d at 43. The court concluded the doctrinal approach depends on the provenance of the alleged burden.

---

the right to privacy as a single concept. *Id.* at 1500 n.8.

ORDER * 10

Claims challenging broad regulatory measures affecting marital relationships are tested against the Equal Protection Clause; meanwhile, claims challenging specific adverse actions against a particular spouse are tested against the First Amendment's doctrine of intimate marital association. *See id.* The Second Circuit reasoned courts' willingness to consider individual intimate association claims under the First Amendment is because retaliatory conduct is often tested against the First Amendment. *See id.*

*Adler* is persuasive in both its logic and facts - it involved a claim that adverse action was taken solely against one spouse in retaliation for the other spouse's conduct. *Id.* at 44. Given these similarities, the Court is persuaded that Plaintiff's alleged constitutional violations should be tested against the First Amendment.[5]

**E. First Amendment Claim**

To establish that a First Amendment retaliation violation occurred, Plaintiff must show that (1) she engaged in protected association; (2) Defendants took an adverse employment action against her; and (3) her association was a substantial or motivating factor for the adverse employment action. *Hudson v. Craven,* 403 F.3d 691, 695 (9th Cir. 2005).

**1. Protected Association**

As a matter of law, Plaintiff's association with her husband is an intimate association entitled to First Amendment protection. *See Adler,* 185 F.3d at 44; *Gray,* 2007 U.S. Dist. LEXIS 22621 at *5.

---

[5]At least one Ninth Circuit district court has considered and agrees with *Adler's* analysis. *See Gray v. Bruneau-Grand View Sch. Dist. No. 365,* 2007 U.S. Dist. LEXIS 22621 (D. Id. Mar. 27, 2007).

ORDER * 11

### 2. Adverse Employment Action

Adverse employment actions include any adverse treatment reasonably likely to deter the individual or others from engaging in a protected activity. *Coszalter v. City of Salem,* 320 F.3d 968, 974 (9th Cir. 2003).[6] Viewing the evidence in Plaintiff's favor, reasonable jurors could conclude that being passed over for employment constitutes an adverse employment action.

### 3. Substantial or Motivating Factor

The Ninth Circuit has articulated three (3) ways a plaintiff can demonstrate retaliation was a substantial or motivating factor behind an adverse employment action. First, a plaintiff can introduce evidence regarding the proximity in time between the protected action and the retaliatory employment decision, from which the jury could logically infer that the plaintiff was adversely acted upon for her protected action. *Id.* at 977. Second, a plaintiff may introduce evidence that her potential employer expressed opposition to the protected activity. *Id.* Third, a plaintiff may introduce evidence that her potential employer's proffered explanations for the adverse employment action were mere pretext. *Id.*

Plaintiff presents sufficient evidence under the first and third options to create genuine factual issues about whether retaliation was a substantial or motivating factor behind the alleged adverse employment

---

[6]The Court is cognizant that cited Ninth Circuit authorities such as *Coszalter* and *Hudson* involve government employers in a more standard free speech context. The articulated standards and analyses are nevertheless helpful.

ORDER * 12

action. With respect to proximity, it is difficult to fit the present facts squarely within the Ninth Circuit's standard because the protected action - the intimate relationship of marriage - is ongoing; there is no isolated moment, such as publicly speaking out against an employer, from which to measure the time before an alleged retaliatory action occurred. That said, Plaintiff put forth sufficient evidence demonstrating a multi-year history of "bad blood" between Defendant Warner and Mr. Roberts. Their history includes the following:

- a heated exchange in 1995 after Mr. Roberts confronted Defendant Warner when one of Defendant Warner's deputies spread false accusations about Mr. Roberts throughout the community;
- a threat by Mr. Roberts to withdraw Ferry County Republican Party's support for Defendant Warner's re-election bid after allegations surfaced that Defendant Warner misappropriated grant funds;
- an incident in September 2004 - the month Plaintiff submitted her corrections officer application - where Defendant Warner forcefully removed Mr. Roberts from the 911 Call Center; and
- an instruction by Defendant Warner in the Fall of 2004 that his deputies not assist Mr. Roberts - a City of Republic Police Officer - if he needed help executing his duties.

Two (2) of these incidents occurred while Plaintiff's application for employment as a corrections officer was pending. Reasonable jurors could

ORDER ~ 13

infer that Defendant Warner refused to hire Plaintiff based on her marriage to Mr. Roberts.

With respect to pretext, reasonable jurors could also conclude that passing over Plaintiff's application "for cause" because she did not reasonably attempt to reschedule her interview is mere pretext to cover a retaliatory action. Viewing the evidence in Plaintiff's favor, Plaintiff passed the CSC physical exam in May 2005. Seven (7) months passed before Defendant Warner granted an interview to Plaintiff, and that was only after she filed a complaint alleging Defendant Warner continued to employ an unqualified person. Reasonable jurors could find that Plaintiff did attempt to reschedule her interview - she left three (3) messages with the Defendant's office - and Defendant Warner simply looked for an excuse to disregard her application. Because factual issues remain about whether retaliation was a substantial or motivating factor behind Defendant Warner's conduct, summary judgment is not appropriate.

Defendants alternatively argue that Plaintiff's claim fails because she ended up in the same position irrespective of Defendant Warner's alleged retaliatory conduct; that is, she would never have taken the corrections officer position because it was part-time, and Plaintiff needed full-time employment. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285 (1977) ("The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if [she] had not engaged in the conduct.") This argument is unpersuasive for two (2) reasons. First, CSC Commissioner Jenkins informed Plaintiff two (2) full-time corrections officer positions were available. (Ct. Rec. 22-2 at 10.) Second, even though

ORDER ~ 14

Defendant Warner informed Plaintiff she would be interviewing for the part-time position, he provided no information about pay or hours. *Id.* Conceivably, a part-time corrections officer position involves more hours and better pay than Plaintiff's existing full-time position. Viewing the evidence in Plaintiff's favor, it cannot conclusively be said that Plaintiff would have refused a part-time corrections officer position. This is an issue for trial.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendants' Motion to Strike **(Ct. Rec. 29)** is **DENIED**.

2. Defendants' Motion for Summary Judgment **(Ct. Rec. 11)** is **GRANTED** (gender discrimination) and **DENIED** (First Amendment retaliation) **IN PART**.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and provide a copies to counsel.

**DATED** this ___5th___ day of December 2008.


                         S/ Edward F. Shea
                         EDWARD F. SHEA
                    United States District Judge

Q:\Civil\2007\149.MSJ.wpd

ORDER * 15